FILED

02 MAY 15 PM 1:45

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

EARTH TECH, INC. a California
Corporation,
TYCO INTERNATIONAL SERVICES, AG,
a Swiss Corporation and TYCO
INTERNATIONAL (US) INC., a Nevada
Corporation,

                     **Plaintiffs/Counter-Defendant,**

-vs-                               **Case No.  6:00-cv-1536-Orl-31JGG**

MIGUEL DELGADO BELLO,

                     **Defendant/Counter-Plaintiff.**

---

# ORDER

This cause comes on for consideration of Plaintiffs' Motion for Sanctions (Doc. 28),

Plaintiffs' Memorandum of Law in Support (Doc. 30), and Defendant's Memorandum in

Opposition (Doc. 46).  The Court held an evidentiary hearing and heard argument from counsel on

October 30, 2001, which was continued on January 18, 2002.  The Court has carefully considered

the Plaintiffs' Amended Complaint, Defendant's Amended Counterclaim, the Plaintiffs' Motion

including the accompanying memoranda, depositions, affidavits, and exhibits, Defendant's

Opposition including the accompanying depositions, affidavits, and exhibits, the arguments of

counsel, the transcripts of the evidentiary hearings, and is otherwise fully advised in the premises.

The Court finds, by clear and convincing evidence, that Defendant, Miguel Delgado Bello

("Delgado"), has engaged in vexatious and bad faith litigation and has given false testimony,



fabricated documents, and committed other discovery abuses, all in an effort to perpetrate a fraud on the Court.   Further, Delgado and his agents have transmitted threatening communications, via facsimile and e-mail, to Plaintiffs in an attempt to force a settlement from the Plaintiffs (in both this case and the related case in Venezuela).   No sanction, short of dismissal, is warranted for Delgado's egregious conduct.   Accordingly, the Court is dismissing Delgado's Counterclaim with prejudice.

## I. BACKGROUND

Plaintiff, Earth Tech, Inc., a wholly-owned subsidiary of Tyco International Ltd., is an architectural, engineering, and construction firm based in Long Beach, California.   (Compl. ¶ 5; Alpert Aff. ¶ 3).[1]   Plaintiff Tyco International (US) Inc. is a global company engaged in numerous and diverse business activities involving, among other things, the manufacturing and distribution of electronic products, plastics, medical and health products, electronic security services, and telecommunications services.   (Compl. ¶ 3; Alpert Aff. ¶ 2).   Plaintiff Tyco International Services, AG is a Swiss Corporation, with a principal place of business in Schaffhausen, Switzerland. (Compl. ¶ 4).   Defendant Miguel Delgado Bello ("Delgado") is a resident of the State of Florida. (Delgado Dep. at 46-49, 73-81.)

In the early 1990's, Delgado was employed by Rust Environment and Infrastructure, Inc. ("Rust"), a subsidiary of Rust North American Holding, Inc.   During his employment, Rust North American Holding formed Grupo Rust International de Venezuela, C.A., for the purpose of obtaining contracts in Venezuela.   In September 1998, Delgado became employed by Earth Tech

---

[1]   Citations to the record are as follows:  the Amended Complaint, dated October 10, 2001 ("Compl."); the Transcript of the October 30, 2001 and January 18, 2002 Hearings ("Tr."); Plaintiffs' hearing exhibits ("Pl. Exh."); Defendant's hearing exhibits ("Def. Exh."); designated deposition testimony ("[witness name] Dep. at ___"); and affidavits ("[affiant name] Aff. ___").

as a result of Earth Tech's acquisition of Rust. Delgado's job was to help find business opportunities for Earth Tech in Venezuela. (Alpert Aff. ¶ 5).

In January 1999, Tyco and Earth Tech submitted a proposal to Pequiven, S.A. ("Pequiven") to construct and manage a major water supply system in Venezuela. Pequiven is a subsidiary of Petroleos de Venezuela, S.A., or "PDVSA," the Venezuelan government-controlled petroleum corporation. In July 1999, Tyco and Earth Tech were awarded the contract for what is called the "Jose Water Project," which supplies water to several petrochemical facilities in Venezuela. It is owned 75% by a Tyco affiliate and 25% by Pequiven. (Alpert Aff. ¶ 6). Pursuant to his job responsibilities, Delgado introduced Earth Tech to the prospect of bidding on the Jose Water Project. However, prior to being awarded the project, Earth Tech terminated Delgado on July 7, 1999, citing his dishonesty, insubordination, and refusal to refrain from engaging in unauthorized practices. (Alpert Aff. ¶¶ 5, 7). Among other things, Earth Tech learned that Delgado had entered into numerous contracts on Earth Tech's behalf -- mostly with his friends and relatives -- contrary to instructions and without any authority. (Alpert Aff. ¶ 8).

In September 1999, Delgado was hired by another engineering firm, McKim & Creed. Delgado was fired by McKim & Creed in October 2000. (Hall Aff. ¶¶ 2, 4).

**The Venezuela and U.S. Litigation**

On August 13, 2000, Delgado filed a lawsuit against Earth Tech and Tyco in Caracas, Venezuela seeking more than $500,000 in so-called "social benefits" allegedly owed to him as a consequence of his termination by Earth Tech. That litigation is still pending. (Alpert Aff. ¶ 9). On November 15, 2000, Earth Tech commenced the instant action, seeking damages for Delgado's breach of the duty of loyalty, including damages arising from the unauthorized contracts Delgado

-3-

signed with his friends and relatives in Venezuela. On March 21, 2001, notwithstanding his own prior pending claims in Venezuela, Delgado filed a counterclaim against Earth Tech in this action asserting various counterclaims for wages, bonuses, and commissions allegedly owed for his work on the Jose Water Project. On April 11, 2001, the Court dismissed Delgado's counterclaim for "Commission and/or Bonus Owed." (Doc. 17). On April 19, 2001, Delgado filed an Amended Counterclaim, (Doc. 18), seeking $4,080,000 in damages.

Between January 2001 and October 2001, numerous e-mails and facsimiles were sent to senior executives of Earth Tech and Tyco, including the CEO of Earth Tech (Diane Creel) and the Chairman and CEO of Tyco (Dennis Kozlowski), apparently by PDVSA, the Venezuelan government-owned oil company and Plaintiffs' business partner. These facsimiles and e-mails threatened that Plaintiffs would suffer grave legal problems, political scandals, and business losses in Venezuela if they did not settle their litigations with Delgado.

On October 5, 2001, Earth Tech filed an Emergency Motion, (Doc. 28), with the Court for leave to file an amended complaint to assert claims against Delgado under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(A), for registering the Internet domain name "tycovenezuela.com"; for a preliminary injunction under Section 43 of the Lanham Act enjoining Delgado from using the "tycovenezuela.com" domain name; and for sanctions against Delgado for refusing to make himself available for deposition and for sending the fabricated facsimiles and e-mails to senior Earth Tech and Tyco executives intending to harass Plaintiffs and coerce them into dropping their claims and paying Delgado a settlement. On October 9, 2001, the Court granted Earth Tech's motion for leave to file its amended complaint and scheduled a hearing on Plaintiffs' motion for injunctive relief and sanctions for October 30, 2001. On November 5, 2001, the Court

-4-

granted Plaintiffs' motion for a preliminary injunction finding that Delgado registered the

tycovenezuela.com domain name in order to gain leverage in the pending litigation.  (Doc. 57,

"Inj. Order").  The Court subsequently conducted a further evidentiary hearing on the sanctions

motion on January 18, 2002.[2]

## II.  FINDINGS OF FACT

### The Threat from Delgado's Venezuelan Attorney

On March 7, 2000, the Chairman and CEO of Tyco, Dennis Kozlowski, received an e-mail

from Delgado's attorney in Venezuela, Alejandro Teran.  (Alpert Aff. Exh. C).  Teran represented

Delgado in his lawsuit against Earth Tech and Tyco in Venezuela.  (Tr. at 167).  The e-mail, which

originated from Teran at "tycoven@aol.com" made this straightforward threat:  if Tyco does not

show a "wiliness [sic] to reconcile these issues," Delgado "will be forced to use other legal and

public methods" to expose Tyco's supposed "illegal activities" and "scandals."  (Alpert Aff. Exh.

C; Pl. Exh. 5).  Subsequently, Delgado carried out this threat when he went to the Venezuelan

press in early 2001 with his accusations that Tyco and Earth Tech engaged in "irregularities,"

"juggling of companies," and "name change games" in order to obtain the Jose Water Project

contract.  (Haven Aff. Exhs. A and D).  These newspaper stories were part of Delgado's campaign

of harassment and public disparagement of Plaintiffs, intended to pressure Plaintiffs into a

settlement.[3]

---

[2]  The evidentiary record received and considered by the Court includes two days of live testimony, forty four hearing exhibits, the various pleadings and memoranda submitted by Plaintiffs and Delgado, nineteen affidavits with accompanying exhibits, designations from six depositions in excess of three hundred pages, and the complete deposition transcript of Philip Gordon.

[3]  Delgado asserts that he terminated Teran's services in February 2000, and thus he should not be held accountable for this e-mail sent by Teran.  (Tr. 89-90).  However, based upon Delgado's later

**The Faxes Allegedly From PDVSA**

After Earth Tech commenced litigation in the United States against Delgado for breach of loyalty, executives at Earth Tech and Tyco began to receive other threats and warnings, but in the form of faxes that appeared to come from PDVSA. They were each identified as coming from PDVSA and purported to express the views of PDVSA. However, none of the faxes was actually signed by any PDVSA official. (Alpert Aff. ¶ 13, Exh. A). Between January 29 and March 28, 2001, Tyco and Earth Tech received seven of these "PDVSA" faxes. The subject of each fax was the litigation with Delgado and Delgado's accusations in the press. (Tr. at 178-79.) The faxes warned Tyco that it would face a "criminal investigation," and that "these matters may get out of hand" in Venezuela, if it does not settle with Delgado.[4] (Alpert Aff. ¶¶ 14-15, Exh. A).

On March 6, 2001, in response to an inquiry from the CEO of Earth Tech (Diane Creel), Eduardo Praselj, the President of Pequiven, the subsidiary of PDVSA, sent a letter stating that the faxes were not PDVSA documents. (Alpert Aff. ¶ 16, Exh. D). Based on Mr. Praselj's letter, Plaintiffs argue that neither PDVSA nor Pequiven sent the faxes. Rather, the faxes originated with Delgado. Delgado admitted that he has no evidence to refute Mr. Praselj's statement. (Tr. at 185). Instead, Delgado relies only on his arguments that Mr. Praselj has no authority to speak for

---

making good on this threat, Delgado's assertions are highly suspect and this Court rejects them.

[4] A fax supposedly sent by PDVSA on January 28, 2001 said that PDVSA was told that Earth Tech was "trying to bribe the courts" and, therefore, "would like a prompt resolution on these issues before they are taken out of contest [sic] by the media and the PDVSA name get involved." Another fax sent on February 15, 2001 warned the Tyco Chairman that, based on information received from Delgado, "PDVSA is clear that your corporation ow[e] these individuals [Delgado] for the services" and "this may bring a criminal investigation against your company" because of Tyco's "lack and willing to settle the above cases." Since these "games are affecting our government and our relationship in PDVSA," the fax went on, "it will be better to have settlement that [sic] win a war that will jeopardize your company and PDVSA." (Alpert Aff. ¶¶ 14-15, Exh. A).

PDVSA, Mr. Praselj's letter constitutes hearsay, and the headers on the faxes indicate that the faxes came from a fax number belonging to PDVSA. (Tr. at 140; Def. Prop. Order at ¶ 2).

During the hearing, Plaintiffs correctly asserted that anyone can program a fax machine to print any number he or she wished to display in the header. Therefore, the number displayed in the fax header is not dispositive on the issue of where the fax originated. Furthermore, the Court has reviewed the faxes and found that they are not signed and do not appear to be on PDVSA letterhead, indicating to the Court that the faxes did not originate from an official at PDVSA, but rather from someone interested in the litigation between Plaintiffs and Delgado. Delgado admitted at the hearing that he has friends at PDVSA whom he visited several times during the pendency of this litigation because they contacted him to see what they could do to help him with the litigation. (Tr. at 211-12). Accordingly, Delgado could have sent the faxes from PDVSA or one of his friends or could have sent the faxes to the Plaintiffs at Delgado's request. However, the best indication of the source of the faxes is the content of the message, which mirrors the charges in the Venezuelan newspaper articles. The source of these articles was Delgado. (Tr. at 204-05). The Plaintiffs have no incentive to send these faxes to themselves. In light of Delgado's other conduct, infra, the Court finds that Delgado was responsible for the transmission of these faxes which were designed to coerce Plaintiffs into a settlement.

**The E-Mails Allegedly Sent from PDVSA**

Soon after Earth Tech alerted Pequiven and PDVSA to the existence of the threatening faxes, they ceased. The last fax was sent on March 28, 2001. However, Plaintiffs then began to receive similar threats in e-mails that also appeared to come from PDVSA. Between April 1, 2001

and October 16, 2001, Earth Tech and Tyco received twelve of these "PDVSA" e-mails. (Alpert Aff. Exhs. B, E; Alpert Reply Aff. Exh. A; Haven Aff. Exhs. A, D).[5] Most of these e-mails were also sent to a third party, Albert Meyer, an analyst at Tice & Associates, an investment fund openly hostile to Tyco, at "ameyer@tice.com." (Alpert Reply Aff. ¶ 5). The first series of these e-mails came from an America Online ("AOL") account with the address "pdvsacitgo@aol.com." Citgo is the name of PDVSA's gasoline retailing business. (Alpert Aff. ¶ 17, Exh. B). Like the fabricated faxes, these "PDVSA" e-mails attempted to intimidate Plaintiffs into dropping their action and settling with Delgado, or else face criminal charges, negative publicity, trouble with the Venezuelan government, and damage to their business relationships in Venezuela.[6]

    April 2, 2001:[7] "[Y]our company reputation plus high executive in PDVSA are at stake." "We believe that it is time to bring this to a low profile conclusion as soon as possible. Approaching these individuals with a serious attitude to negotiate a settlement . . . could benefit in slowing down these public relation campaigns against Tyco."

    April 3, 2001: "Tyco and Tyco Flow Control are moving closer to a CRIMINAL INVASTIGATION." [sic] "We in PDVSA would have no part in defending or hiding evidence nor protecting a company on these kinds of activities."

    April 18, 2001: "Delgado was at PDVSA yesterday. Delgado was talking to high ranking officials . . . The PDVSA and government officials do not understand this game they believe that it will not be beneficial for anyone."

---

    [5] The Tyco employee responsible for computer security, Douglas Haven, testified that each of the subject e-mails addressed to Tyco was sent to and received by Tyco's e-mail server and that he preserved the e-mails in the form in which they were received. (Haven Aff. ¶ 2; Haven Dep. at 21-26). Delgado's own expert testified that he had no reason to doubt that the e-mails were sent to and received by Tyco. (Taylor Dep. at 73-74).

    [6] These e-mails defamed, as well as threatened, Plaintiffs. Further, there is no record evidence that Plaintiffs were ever subject to a criminal investigation in Venezuela.

    [7] This e-mail was sent to Tyco on April 2, 2001. (Haven Aff. Exh. A; Pl. Exh. 10). The same e-mail was sent to Earth Tech on April 1, 2001. (Alpert Aff. Exh. B).

On May 2, 2001, Earth Tech served a subpoena on AOL to try to determine the source of the "pdvsacitgo@aol" e-mails. (Pl. Exh. 22). Delgado admitted that he learned about the subpoena. (Tr. at 232-33). Thereafter, no further e-mails were received from "pdvsacitgo@aol."

However, beginning on May 20, 2001 and continuing through October 16, 2001, Plaintiffs received a second string of threatening e-mails purporting to come from PDVSA. The remaining e-mails came from accounts established with UnitedStates.com, a free e-mail service provider, with these addresses: "citgopdvsa@venezuela.com," "pdvsacitgo@venezuela.com," and "pdvsa@unitedstates.com." (Alpert Aff. ¶ 17, Exh. B; Alpert Reply Aff. ¶ 3, Exh. A; Haven Aff. ¶ 2). These "PDVSA" e-mails were even more threatening and disparaging than those from the AOL account.[8]

---

[8] For example:

> May 20, 2001: "These legal complications and rumors are getting to the ears of President Chavez; he is very upset." "The government and PDVSA would like to have these matters resolve before the game could back fire on you and hurt PDVSA image."

> June 6, 2001: "[W]e may have another Watergate Venezuelan style . . . Tyco may want to exercise caution and try to resolve these matters without getting PDVSA in these affairs."

> June 19, 2001: "Tyco is being investigated along with Earth Tech's executives for fraud and kick backs to Venezuelan officials and judges."

> October 15, 2001: "Here at PDVSA, we are very worry [sic] on the latest development on your legal matters in Venezuela . . . We have been told that your idea is destroying these individuals that help you."

> October 16, 2001: "PDVSA and Government are worry that your company stubbornness will bring out to the public sensitive information." "[S]ooner or later the labor benefits must be paid."

**Delgado Is the Author of the E-Mails**

Like the faxes, the subject matter of the e-mails suggests that Delgado is the author.  The newspaper articles attached to the e-mails are similar in content and Delgado admitted that he was the source of the newspaper articles.  (Tr. at 204-05).  Further, Delgado provided the Court with no plausible explanation or credible evidence as to why anyone, other than he, would be so obsessed with his claims and so highly motivated to harass Plaintiffs.  Delgado's stake in the litigations is extremely personal and he has a powerful motive to pressure plaintiffs into paying him money.  According to Delgado, the monetary value of the Venezuela and U.S. litigations is "very significant to me."  (Delgado Dep. at 20).  Between November 2000 and November 2001, Delgado earned only $2,000 as a "consultant" and received another $5,000 to $10,000 from his family.  (Delgado Dep. at 13-20).

Also, an examination of the attachments to the e-mails also proves that Delgado created and sent the e-mails.  Both the April 2, 2001 and April 3, 2001 e-mails from "pdvsacitgo@aol" included as attachments electronic versions of newspaper articles from "Tal Cual Lunes."  The April 2, 2001 e-mail included a document entitled "Tal Cual Lunes 26 de Marzo de 2001.doc" and the April 3, 2001 e-mail included a document entitled "Tal Cual Lunes 2 de Abril de 2001.doc."  (Haven Aff. ¶¶ 3, 8; Exh. A, D).  The attachments to both these e-mails are in the form of a word processing file created using Microsoft Word software.  The newspaper articles were downloaded from the Internet from www.talcualdigital.com and then saved as Microsoft Word documents.  The files containing the articles were then attached to the e-mails.  (Haven Aff. ¶¶ 4, 9).  Information identifying the person who created these documents and the computer used to create and send the documents is stored electronically within the documents themselves.  (Haven Aff. ¶¶

5-9; Exhs. B, E).  The author of the two documents attached to the April 2, and April 3, 2001

e-mails is "Miguel."  (Haven Aff. Exhs. B, E).

   In addition, the Microsoft Word software embeds certain background codes that track each

document's electronic history.  These codes are known as "metadata."  The metadata contained

within the Word documents attached to both e-mails also establishes that "Miguel" created each

document.  The documents were created with a Spanish-language version of Microsoft Word,

"Documento Microsoft Word."  The documents were stored on the C drive of the user's computer

entitled "Miguel8C:" and "Miguel7C:" in a directory called "Misdocumentos" or "My

Documents" in Spanish.  The documents were created, edited, and saved by "Miguel."  Each time

the document was accessed, the user is identified as "Miguel."  (Tr. at 15-22; Haven Aff. ¶¶ 7, 10,

Exhs. C, F).

   Delgado claims that he never had a company named Miguel & Company, that he never

encrypted that name in any computer, that anyone could have reinstalled Microsoft Word on a

computer and registered it as Miguel, that his laptop computer was stolen in May 2001, and that he

never used another computer.  However, Delgado admitted that he checked his e-mail account on

December 4, 2001 and that his e-mail account was empty.[9]  (Tr. at 252-55).  Obviously, Delgado

lied about having access to another computer.  In light of all the evidence and Delgado's

willingness to lie,[10] Delgado's contentions that someone else reinstalled Microsoft Word in order

--------------------------------------------

[9]  Delgado's attorney also accused Plaintiffs counsel of erasing Delgado's e-emails.

[10]  Although unrelated to this lawsuit, Delgado created a fake document and lied to his former
employer in 1998 about his qualifications.  On August 2, 1998 while Earth Tech was in process of
purchasing Rust, Delgado sent an e-mail to Earth Tech outlining his professional background,
education, and expertise.  (Pl. Exh.. 35; Tr. at 260-65).  Delgado represented that he received a B.S.
Degree in Civil Engineering from the University of Texas at Arlington in 1980.  On April 15, 1999,

to implicate him are not worthy of belief.

Moreover, in addition to creating and using the phony "PDVSA" e-mail accounts at AOL, Delgado logged on to his personal AOL account, "migueld285@aol," using the screen name "Pdvsa." (Pl. Exh. 9). The AOL records for Delgado's personal e-mail account show the dates and times when Delgado logged on to AOL. (Pl. Exh. 9; Tr. at 190-91). Delgado usually used the screen name "migueld285."[11] (Tr. at 187-89). However, on sixteen occasions between January 17, 2001 and April 18, 2001, Delgado logged on to his personal AOL account using the screen name "Pdvsa." (Pl. Exh. 9 at 7, 11, 12, 16, 17, 18, 19, 20, 21, 22.) On many occasions, Delgado logged on as "Pdvsa" in between sessions as "migueld285."[12] (Tr. at 198; Pl. Exh. 9 at 7, 19, 20, 21, 22). Although Tyco and Earth Tech did not receive e-mails from this particular account, this

---

Delgado sent another e-mail to another Earth Tech official with the same information about his background. (Pl. Exh. 36; Tr. at 265). Delgado admitted that he never graduated from the University of Texas and that this information was false. (Tr. at 260-65). However, he tried to excuse his attempts to mislead his employer by stating that he just copied the information from a marketing brochure. (Id.). During the pendency of this litigation, Earth Tech found a diploma from the University of Texas in Delgado's personnel file showing that he received a B.S. in Civil Engineering in 1980. Upon contacting the registrar at the University of Texas at Arlington, Plaintiffs learned that the diploma was a fraud and that Delgado never graduated. The only person who had a motive for creating the fraudulent diploma and lying about his qualifications was Delgado.

[11] Delgado's wife Cecilia used the screen name "cecil958" and Delgado's daughter Maria used the screen name "mari405." (Tr. at 187-89).

[12] For example:

| | | |
|---|---|---|
| 01-04-18 | 06:51 | migueld285 |
| 01-04-18 | 06:48 | Pdvsa |
| 01-04-18 | 06:45 | migueld285 |
| 01-02-01 | 06:17 | migueld285 |
| 01-02-01 | 06:13 | Pdvsa |
| 01-02-01 | 06:10 | migueld285 |

(Pl. Exh. 9 at 7, 20).

confirms Delgado's practice of posing as PDVSA on the Internet.[13]

Further, the evidence demonstrates that Delgado created the AOL and UnitedStates.com accounts from which the e-mails were sent. Delgado created the "PDVSA" e-mail account at AOL ("pdvsacitgo@aol.com") by using the American Express corporate account number of his former employer, William Hall of McKim & Creed. (Pl. Exhs. 2, 3, 9, 13-15, 17-20; Hall Aff. Exh. A; Hall Reply Aff. Exh. A). The AOL e-mail account entitled "pdvsacitgo@aol" was opened on January 28, 2001 in the name of "William Hall" at 249 N. Front Street, Wilmington, North Carolina, phone number 819-233-8091. (Pl. Exh. 2). From this alone it is doubtful that Mr. Hall actually opened the account as the address and the telephone number are each off by one digit, an apparent attempt to make the fraudulent account untraceable. Also, the AOL billing information for the "pdvsacitgo@aol" account shows that Mr. Hall's American Express corporate credit card number 378261409641026 was used to open the account. (Pl. Exh. 3). Mr. Hall testified that he did not set up or authorize the "pdvsacitgo@aol" account and did not send the offending e-mails. Mr. Hall had no interest in pretending to be PDVSA in order to intimidate Earth Tech or Tyco into settling with Delgado. (Hall Aff. ¶¶ 4-12). Delgado offered no credible evidence to refute Mr. Hall's testimony, nor any plausible explanation why Mr. Hall would send phony e-mails.

---

[13] Delgado attempted to explain that on these occasions, he logged on as "migueld285" and then quickly logged off; someone else then immediately logged on as "Pdvsa" and quickly logged off; and then he immediately logged back on as "migueld285." (Tr. 190-94). Delgado also claimed that an unnamed former PDVSA employee who now works for Earth Tech actually set up this "pdvsa@aol.com" screen name several years ago. (Tr. at 149, 151, 272). Delgado's testimony that a "total stranger," or for this matter the former PDVSA employee, repeatedly logged on to his AOL account as "Pdvsa," just minutes after and minutes before he logged on, is not credible. (Tr. 190-94). The only credible evidence is that during the same period Delgado was sending the fabricated "PDVSA" faxes and e-mails to plaintiffs, Delgado was pretending to be PDVSA when he used his own AOL account.

From this evidence, it is obvious that Delgado was the author of the e-mails. However, any doubt about Delgado being the creator of the "pdvsacitgo@aol" account are dispelled after a review of the following evidence. After Delgado was fired by McKim & Creed in October 2000, Mr. Hall discovered that Delgado made numerous unauthorized charges with Mr. Hall's American Express corporate account number. (Pl. Exhs. 2, 3, 9, 13-15, 17-20; Hall Aff. ¶ 5, Exh. A; Hall Reply Aff. Exh. A). Those fraudulent charges are as follows:

1)  On January 11, 2001, Mr. Hall's American Express account was charged for an American Airlines ticket to Dallas, Texas. The American Express receipt indicates that the charge was made by "Delgado/Miguel." (Pl. Exh. 15). Delgado admitted that he frequently travels to Dallas. (Tr. at 224; Delgado Dep. at 235-39).

2)  On January 12, 2001, Mr. Hall's American Express account was charged for an Avis car rental in Dallas, Texas. The American Express receipt indicates that the charge was made by "Delgado, Miguel." (Pl. Exh. 15). Delgado denied renting this car.

3)  On January 28, 2001, the "pdvsacitgo@aol" account was created using Mr. Hall's American Express account number. (Pl. Exhs. 2, 3).

4)  On January 30 and 31, 2001, Mr. Hall's American Express account was charged for an online database search on a website called "KnowX.com." (Pl. Exhs. 13, 14). KnowX.com charges customers for searches of public records. The person who made the searches identified himself as "pdvsacitgo" and listed his e-mail address as "pdvsacitgo@aol.com." (Pl. Exh. 14). Mr. Hall testified that he did not use the KnowX.com website, nor did he authorize anyone to use his American Express account for that purpose. (Hall Aff. ¶¶ 9-11). Indeed, the subject of the searches demonstrates that Delgado conducted the searches. Every search was for information about either Delgado himself, Earth Tech, or one of Delgado's other former employers. (Hall Aff. ¶¶ 6-8, Exh. A; Pl. Exh. 14).

5)  On March 19, 2001, Mr. Hall's American Express account was charged for an Avis car rental in Orlando, Florida. The American Express receipt indicates that the charge was made by "Delgado, Miguel." (Pl. Exh. 17). Orlando is Delgado's home in the United States and he is in Orlando frequently to visit his wife and children. (Tr. at 227-28).

6)  On April 16, 2001, Mr. Hall's American Express account was charged for an Avis car rental in Orlando, Florida. The American Express receipt indicates that the charge was made by "Delgado, Miguel." (Pl. Exh. 18).

7)  On April 22, 2001, Mr. Hall's American Express account was charged for an Avis car rental in Orlando, Florida. The American Express receipt indicates that the charge was made by "Delgado, Miguel." (Pl. Exh. 19). In addition, the Avis invoice for that car rental indicates that the car was rented to "Delgado Miguel," lists Delgado's Florida driver's license # FLD423542513840, and lists Delgado's Avis "Wiz" number XK796T. (Pl. Exh. 20).

At the January hearing, Delgado denied incurring any of these American Express charges, but offered no credible evidence to refute Mr. Hall's testimony or explain why his name appears on all the American Express and Avis records. (Tr. at 224-31). But then, during redirect examination, Delgado admitted that these are his driver's license and Wiz numbers. (Delgado Dep. at 46; Tr. at 230). Delgado further testified that Avis requires that the person renting the car show a driver's license that matches the invoice: "they check your driver's license to see if it's the same driver's license they check." (Tr. at 275). Thus, no person other than Delgado could have gotten past the Avis counter without showing a driver's license. Since Delgado's license number, name and Wiz number appear on the Avis profile, Delgado is the only person who could have possibly rented the car and charged that rental to Mr. Hall's American Express account. (Tr. at 297). In sum, the indisputable evidence shows that Delgado fraudulently used Mr. Hall's American Express corporate account number on numerous occasions, including the creation of the "pdvsacitgo@aol" account on January 28, 2001.

Additionally, the evidence is overwhelming that Delgado created and used the four e-mail accounts at UnitedStates.com from where several other threatening e-mails originated: "pdvsacitgo@venezuela.com," "citgopdvsa@venezuela.com," "pdvsa@unitedstates.com," and

"tycovenezuela@venezuela.com." First, the CEO of UnitedStates.com, Philip Gordon, testified that each of these e-mail accounts was created by using the free e-mail service provided by UnitedStates.com. He testified that the password for each of these accounts is "crismar423542."[14] This is also the password Delgado created and used for his personal e-mail account at United States.com--"migueld285@myplace.com."[15] (Gordon Aff. ¶¶ 2-4; Gordon Dep. at 119-24; Tr. at 146 & 236; Pl. Exh. 24 at 5). Delgado explained that "crismar" is an amalgam of the names of his children, Cristina and Maria and 423542 is a portion of his driver's license number. (Tr. at 229-30). Since Delgado's personal password is the password for each of the fraudulent "PDVSA" e-mail accounts at UnitedStates.com, it is clear that Delgado created those accounts and is responsible for the extortionate e-mails sent to plaintiffs from those accounts.

Delgado's creation and use of the UnitedStates.com accounts is further confirmed by the fact that one of those accounts ("tycovenezuela@venezuela.com") was used to announce the launch of the "tycovenezuela.com" website, which Delgado admittedly created. Furthermore, Delgado's second Venezuelan attorney, Glenn Morales,[16] sent e-mails to Tyco using accounts

---

[14] On December 4, 2001, on Plaintiffs' Motion for Protective Order and Restraining Order to Preserve Evidence, the Court prohibited Delgado from "changing, altering, or tampering with the password." The Court stated that it was "concerned that Defendant [Delgado] may take steps to spoliate evidence concerning e-mail communications at issue in this case."

[15] Delgado asserted that Mr. Atkins changed the password on the accounts in October 2001. However, Mr. Gordon testified that to his knowledge the password had never been changed and was always the same each time he looked at the accounts in both October and December. (Gordon Dep. at 123-24; Tr. at 299-300). Further, Mr. Atkins represented to this Court that he had not changed the passwords or in any way tampered with the accounts.

[16] Delgado claimed that Morales was not his attorney because he had not executed a power of attorney as required in Venezuela for an attorney to recover fees, but he admitted that Morales was referred to him by a friend and that he had instructed Morales to "show me what you can do." (Delgado Aff., Oct. 22, 2001, ¶ 8). Morales himself represented to Tyco that he was Delgado's attorney. (Alpert Reply Aff. ¶¶ 6-7, Exh. B; Pl. Exh. 26).

created at UnitedStates.com. (Alpert Aff. Exh. C; Gordon Aff. ¶ 2; Pl. Exh. 26). The e-mail

Morales sent on July 27, 2001 had the exact same list of Tyco recipients, in exactly the same order,

as the e-mails Tyco received from "pdvsacitgo@venezuela.com" on June 19, 20, and 27, 2001.

(Alpert Aff. Exh. B; Tr. at 246-48; Pl. Exh. 26). Finally, at the January 18, 2002 hearing, Delgado

demonstrated for the Court that he knows exactly how to create phony e-mail accounts at

UnitedStates.com using other people's names, and that he has actually done so when he showed

this Court an e-mail purportedly created by Attorney Robert Atkins which was in fact created by

Delgado. (Tr. at 160-64). Hence, the evidence is clear and convincing that Delgado was

responsible for transmitting the phony and threatening e-mails from both the AOL and

UnitedStates.com accounts in order to coerce a settlement.[17]

## III. CONCLUSIONS OF LAW

### A. Dismissal under the Court's Inherent Power

Plaintiffs seek the dismissal of Delgado's counterclaims pursuant to the inherent power of

the Court.[18] The courts have inherent power to impose sanctions, including dismissal, for abusive

---

[17] Delgado's assertions that Plaintiffs created and sent these e-mails to themselves is unworthy of belief and defies logic. Even assuming for argument's sake that Plaintiffs created and sent the e-mails to themselves, this begs the question why Plaintiffs would also send these e-mails to Albert Meyer at Tice & Associates, who is undisputedly adverse to Plaintiffs interests and who has tried to drive down Tyco's market value by encouraging investors to short-sell Tyco stock. (Albert Reply Aff. ¶ 5). The only plausible explanation is that Delgado sent these e-mails to Plaintiffs and Albert Meyer to increase pressure on Plaintiffs to pay Delgado a settlement.

[18] Plaintiffs also request this Court to dismiss Defendant's counterclaim as a sanction under Rule 37(d) of the Federal Rules of Civil Procedure for his failure to appear at his scheduled deposition in August 2001. It is undisputed that Plaintiffs repeatedly attempted to set a date for Delgado's deposition from April 24, 2001 to June 28, 2001, Delgado was properly noticed for deposition on August 17, 2001, Delgado unilaterally cancelled the deposition citing illness as the reason he could not attend, he did not offer an alternative date, and he did not reschedule his deposition despite his ability to meet with Plaintiffs' counsel in Venezuela within two weeks of his scheduled deposition. In support of their motion for sanctions, Plaintiffs' Venezuelan counsel testified by affidavit that

litigation practices.  See Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991); Vargas v. Peltz, 901

F. Supp. 1572, 1579 (S.D. Fla. 1995).  This includes the "power to dismiss an action for

misconduct that abuses the judicial process and threatens the integrity of that process--including

misconduct unrelated to the merits of the case."  Vargas, 901 F.Supp. at 1582.  Courts have

dismissed cases based on plaintiffs' fabrication of evidence and false testimony.  See, e.g., Vargas,

901 F. Supp. at 1578; see also Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118-20 (1st Cir. 1989)

("[A] federal district court possesses the inherent power to deny the court's processes to one who

defiles the judicial system by committing a fraud on the court.");  Pope v. Federal Express Corp.,

974 F.2d 982, 984 (8th Cir. 1992).  However, a court should be reluctant to impose the harsh

sanction of dismissal with prejudice where the plaintiff is not actually culpable.  Goforth v.

Owens, 766 F.2d 1533, 1535 (11th Cir. 1985).  The Eleventh Circuit has explained that "[t]he key

to unlocking a court's inherent power is a finding of bad faith."  Byrne v. Nezhat, 261 F.3d 1075,

1106 (11th Cir. 2001) (quoting Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998));  In re

Mroz, 65 F.3d 1567, 1575 (11th Cir. 1995).  Dismissal is generally proper where less drastic

---

Delgado appeared at the August 29, 2001 meeting in apparently good health and partook of alcoholic
beverages during the meeting.  Despite this, Plaintiffs did not file a motion to compel Delgado's
appearance at a deposition and only notified this Court of Delgado's failure to make himself available
for deposition in their October 5, 2001 Motion for Sanctions (Doc. 28 ).

   Furthermore, Delgado did appear for a deposition in December 2001, as ordered by this Court
and Plaintiffs have not argued that they were prejudiced by the delay in deposing Delgado.  Moreover,
without either a motion to compel filed by the Plaintiffs or the violation of an order of this Court
compelling discovery, dismissal under Rule 37 is an inappropriate sanction.  See United States v.
Certain Real Property Located at Route 1, Bryant, Ala., 126 F.3d 1314, 1317 (11th Cir. 1997) (citing
Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1542 (11th Cir. 1993) ("[A] default judgment sanction
requires a willful or bad faith failure to obey a discovery order. . . .  Violation of a discovery order
caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37
default judgment or dismissal.") (citation omitted)).

sanctions would be ineffective.  Aztec Steel Co. v. Florida Steel Corp., 691 F.2d 480, 481-482

(11th Cir. 1982); see also Jones v. Graham, 709 F.2d 1457, 1458 (11th Cir. 1983) ("Although the

standard of review on appeal is abuse of discretion, dismissal of an action with prejudice 'is a

sanction of last resort, applicable only in extreme circumstances.'") (citations omitted); Malautea,

987 F.2d at 1545 (any court has the inherent power to impose reasonable and appropriate sanctions

upon those appearing before it).

     Courts have also dismissed cases pursuant to Rule 41(b) of the Federal Rules of Civil

Procedure.  See McDowell v. Seaboard Farms of Athens, Inc., No. 95-609-CIV-ORL-19, 1996

WL 684140 (M.D. Fla. 1996) (citing Pope v. Federal Express Corp., 138 F.R.D. 675 (W.D. Mo.

1990), aff'd in part, vacated in part on other grounds, 974 F.2d 982 (8th Cir. 1992)).  In Pope, the

court stated that "[d]ishonest conduct by a party has been recognized as grounds for dismissal with

prejudice under Rule 41(b)."  138 F.R.D. at 682 (citation omitted).  It further stated that

"[d]ismissal under Rule 41(b) has been held appropriate where plaintiff has engaged in bad faith or

egregious conduct, or where plaintiff's conduct threatens the very integrity of the judicial process."

Id. (citation omitted).

     Here, Delgado has shown that he is willing to go to any length in this and the Venezuelan

litigation to influence the Plaintiffs to settle with him.  As a result he has forced this Court to turn

attention and judicial resources away from litigants with legitimate claims in order to wade

through the morass he has created.  Delgado has put in motion an "unconscionable scheme

calculated to interfere with the judicial system's ability . . . to adjudicate a matter . . . ." Vargas,

901 F. Supp. at 1581-82.  Delgado has shown disdain and disrespect for the judicial process by

lying repeatedly to this Court under oath about his involvement with the phony e-mails and faxes,

the use of Mr. Hall's credit card, and his fabrication of the fraudulent diploma.  His conduct has reached the pinnacle of bad faith and as such warrants the ultimate sanction of dismissal of all counterclaims.  See generally Richardson v. Cabarrus County Bd. of Educ., 151 F.3d 1030, unpub. op., (4th Cir. 1998) (threatening harm to defense witnesses if defendant's did not settle with plaintiff); Vargas, 901 F.Supp. at 1579-82; McDowell, 1996 WL 684140 at *2-*4.  This Court finds that nothing short of dismissal would effectively curb Delgado's egregious conduct.

## B.  Sanctions under 28 U.S.C. § 1927

Finally, Plaintiffs seek sanctions against Delgado's attorney, Robert Rasch, under 42 U.S.C. § 1927.  Section 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  Section 1927 is penal in nature and must be strictly construed.  Id. (citing Monk v. Roadway Express, Inc., 599 F.2d 1378, 1382 (5th Cir. 1979), aff'd sub nom., Roadway Express, Inc. v. Piper, 447 U.S. 752 (1980)) (declaring that § 1927 is not a "catch-all" provision for sanctioning objectionable conduct by counsel).[19]  Moreover, the legislative history of the statute is sparse, and the cases interpreting it are not very helpful in divining the congressional purpose.  United States v. Ross, 535 F.2d 346, 349 (6th Cir. 1976).  The Eleventh Circuit has acknowledged that "there is little case law in th[e] circuit concerning the standards applicable to the award of sanctions under § 1927."  Peterson v. BMI Refractories, 124 F.3d 1386, 1395 (11th Cir. 1997).

The plain language of the section sets forth three requirements to justify an imposition of

---

[19]  All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

sanctions:  (1) an attorney must engage in "unreasonable and vexatious" conduct; (2) such "unreasonable and vexatious" conduct must "multipl[y] the proceedings"; and (3) the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct.  McMahan v. Toto, 256 F.3d 1120, 1128 (11th Cir. 2001) (citing Peterson, 124 F.3d at 1396).  Vexatious is not defined in the statute.  When words are not defined in the statute, they "must be given their ordinary meaning."  Chapman v. United States, 500 U.S. 453, 462 (1991).  Webster's Third New International Dictionary (1971) defines "vexatious" as "lacking justification and intended to harass."  Ross, 535 F.2d at 349; see also Voss v. USS Great Lakes Fleet, Inc., 35 F.3d 567, unpubl. op. (6th Cir. 1994); Black's Law Dictionary 1559 (7th ed. 1999) (defining "vexatious" as "without reasonable or probable cause or excuse").

Some courts have construed the language "unreasonably and vexatiously" to require a showing of intent, recklessness, or bad faith.  Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd., 760 F.2d 1045, 1048 (9th Cir. 1985); United States v. Blodgett, 709 F.2d 608, 610 (9th Cir. 1983); Baker Indus., Inc. v. Cerberus, 764 F.2d 204, 208 (3rd Cir. 1985); West Virginia v. Charles Pfizer & Co., 440 F.2d 1079 (2d Cir. 1971).  Other courts have ruled that § 1927 does not require a demonstration of subjective bad faith as a precondition to the imposition of sanctions.  Rather, these courts have stated that § 1927 requires a more relaxed, objective standard that does not require conscious impropriety.   Knorr Brake Corp. v. Harbil, Inc., 738 F.2d 223, 226-27 (7th Cir. 1984); In re Ruben, 825 F.2d 977, 983-84 (6th Cir. 1987); Jones v. Continental Corp., 789 F.2d 1225, 1230 (6th Cir. 1986); Lewis v. Brown & Root, Inc., 711 F.2d 1287, 1291-92 (5th Cir. 1983); see also Cruz v. Savage, 896 F.2d 626, 631-32 (1st Cir. 1990) and cases cited therein ("Behavior is 'vexatious' when it is harassing or annoying, regardless of whether it is intended to be so. . . .  It is enough that an attorney acts in disregard of whether his conduct constitutes harassment or

vexation, thus displaying a 'serious and studied disregard for the orderly process of justice.').

All of the courts, including those applying a lesser standard, at minimum agree that merely unintended, inadvertent, and negligent acts will not support the imposition of sanctions under § 1927. Cruz, 896 F.2d at 632; Ruben, 825 F.2d at 984. Rather, the power to impose sanctions under § 1927 should be exercised "only in instances of a serious and studied disregard for the orderly processes of justice." Kiefel v. Las Vegas Hacienda, Inc., 404 F.2d 1163, 1167 (7th Cir. 1968) (concluding that Congress intended to impose a sanction on conduct more culpable than mere unintentional discourtesy to a court when it conjoined the word "vexatiously" with "unreasonably").

Here, Plaintiffs assert that Rasch made baseless, scandalous, and libelous accusations against both Plaintiffs and Plaintiffs' counsel in this litigation. Plaintiffs further contend that these accusations were unreasonable, vexatious, and so multiplied the proceedings that they warrant sanctions against Rasch. Specifically, Plaintiffs point to the following accusations made by Rasch in support of their motion: 1) Plaintiffs and their counsel of fabricating the phony e-mails and faxes, that were actually created and transmitted by Delgado; 2) Plaintiffs and Plaintiffs counsel of creating phony e-mail accounts in order to create and send these phony e-mails; 3) Plaintiffs' counsel conspired with Philip Gordon the owner of myplace.com to obtain the passwords to Delgado's account and erase all of Delgado's personal e-mail account; and 4) Plaintiffs hired a "body guard" in Venezuela to threaten Delgado if he did not drop the Venezuelan suit.[20] (Doc. 82,

_____

[20] Rasch also accused Plaintiffs' counsel of fabricating the excuse of a ski accident to thwart the discovery and deposition of Philip Gordon. However, this accusation was patently false as Mr. Gordon was involved in a serious ski accident in mid-December.

-22-

Def. Mot. for Sanctions). Moreover, at the October 18, 2001 hearing, Rasch attempted to introduce into evidence a letter sent by Delgado and Rasch to the FBI, which was mailed just days before and which urged an investigation of Plaintiffs.  This letter to the FBI, as well as the Rasch's accusations in open court and in the papers filed in this case, were nothing more than an attempt to harass, annoy, and turn the focus of this litigation away from the pleadings and Delgado's improper actions during the course of this litigation.

The Court finds by clear and convincing evidence that Rasch's accusations against both Plaintiffs and their counsel are completely baseless, are devoid of merit, were an abuse of the judicial system, and were made in bad faith.  The Eleventh Circuit has stated that, a court may "assess attorney's fees against litigants, counsel, and law firms who willfully abuse the judicial process by conduct tantamount to bad faith." Malautea, 987 F.2d at 1544 (quoting Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991) (citation omitted) (affirming assessment of fees under § 1927 and Rule 11)). Thus, sanctions are warranted under 28 U.S.C. § 1927.

## IV. CONCLUSION

Based on the foregoing, it is therefore,

**ORDERED AND ADJUDGED** that

1)      Plaintiffs' Motion for Sanctions (Doc. 28), is hereby GRANTED;

2)      Defendant's counterclaims are hereby DISMISSED with prejudice pursuant to this Court's inherent power;

3)      Defendant Delgado is ORDERED to pay all reasonable attorney's fees and costs associated with the prosecution of their motion for sanctions and defense of the Defendant's counterclaims.

4)      Plaintiffs shall submit a bill of costs and application for attorney's fees together with supporting affidavits within thirty (30) days of this Order.  Defendant Delgado shall have twenty (20) days to file his Response together with a request for an evidentiary hearing, should he so desire.

5)      Defendant's counsel, Robert Rasch, is ORDERED to pay attorney's fees as a sanction for his conduct in violation of 28 U.S.C. § 1927.

6)      Accordingly, Plaintiffs shall submit an application for attorney's fees and expenses indicating which fees and expenses Plaintiffs attribute to the conduct of Defendant's counsel. Defendant's counsel shall have twenty (20) days to file his Response together with a request for an evidentiary hearing, should he so desire.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this _15_ day of May, 2002.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

-24-

F I L E   C O P Y

Date Printed: 05/15/2002

Notice sent to:

Carlos J. Burruezo, Esq.
Fisher & Phillips LLP
Lincoln Plaza, Suite 1250
300 S. Orange Ave.
Orlando, FL  32801

Juan C. Lopez-Campillo, Esq.
Fisher & Phillips LLP
Lincoln Plaza, Suite 1250
300 S. Orange Ave.
Orlando, FL  32801

Randall W. Lord, Esq.
Jackson, Lewis, Schnitzler & Krupman
390 N. Orange Ave., Suite 1285
P.O. Box 3389
Orlando, FL  32801-3389

Michael M. Hernandez, Esq.
Jackson Lewis Schnitzler & Krupman
First Union Financial Center - Suite 2600
200 S. Biscayne Blvd.
Miami, FL  33131-2374

Martin London, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY  10019-6065

Robert A. Atkins, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY  10019-6065

Mathew S. Rosengart, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY  10019-6065

Tucker H. Byrd, Esq.
Greenberg Traurig, P.A.
450 N. Orange Ave., Suite 650
P.O. Box 4923
Orlando, FL  32802-4923

Robert W. Rasch, Esq.
Law Office of Robert W. Rasch
201 Live Oak Lane
Altamonte Springs, FL  32714

Miguel Delgado Bello
El Cafetal (Sector Santa Ana)